TOMPKINS et al. v. CREIGHTON–McSHANE OIL CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 10, 1908. On Rehearing, April 3, 1908.)

No. 1,734.

1. EVIDENCE—EXTRINSIC EVIDENCE TO EXPLAIN DEED—IDENTIFICATION OF SUBJECT-MATTER.

Where a deed made in 1840 purporting to convey land certificates issued by the Land Commissioners of a Texas county was inexact and ambiguous in its description, external evidence was admissible to identify a certificate intended to be conveyed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, §§ 2116, 2117.]

2. PUBLIC LANDS—DISPOSAL OF TEXAS LANDS—VALIDITY OF GRANT.

The Texas statute of August 28, 1856 (Pen. Code 1857, art. 244), prohibiting any district surveyor from "being concerned in the purchase of any right, title or interest in any public land in his own name or in the

name of any other person" under penalty of removal from office, a fine, and exclusion from subsequently holding office, did not invalidate the title to lands so acquired by a surveyor in violation of its provisions.

3. ADVERSE POSSESSION—TITLE BY PRESCRIPTION—TEXAS STATUTE.

Under Rev. St. Tex. 1879, art. 3198, actual and visible possession of land only can afford a basis for title by prescription.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Adverse Possession, §§ 77–81, 123.]

4. EXECUTION—SALE—CONVEYANCE TO PURCHASER—CONSTRUCTION AND EFFECT.

A sheriff's deed executed in 1848 purporting to be based on a judgment, execution, levy, and sale, and to convey a Texas land certificate, may be received in evidence as proof of title, although the record of the suit has been lost or destroyed, and is presumptive evidence of the regularity of the proceedings, and under the decisions of the Supreme Court of the state passes title to the certificate if such title could have been conveyed by the judgment defendant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 21, Execution, §§ 935–939.

Conclusiveness of judgment between federal and state courts, see notes to Kansas City, Ft. S. & M. R. Co. v. Morgan, 21 C. C. A. 478; Union Planters' Bank v. City of Memphis, 49 C. C. A. 408.]

5. SAME — TEXAS LAND CERTIFICATE — NONDELIVERY — SALE ON EXECUTION AGAINST VENDOR.

Under the law of Texas a land certificate issued by authority of the state until located is personal property which may be transferred, and, where a purchaser of such a certificate left it in the possession of his vendor, a levy upon and sale of the same as the property of such vendor eight years afterward passed title thereto as against the prior purchaser.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

6. TRESPASS TO TRY TITLE—EVIDENCE OF TITLE—QUESTIONS FOR JURY.

Evidence introduced by both plaintiff and defendants in an action of trespass to try title considered, and *held* such as to require the submission of the question of title to the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trespass to Try Title, § 66.]

In Error to the Circuit Court of the United States for the Eastern District of Texas.

D. F. Rowe and H. N. Atkinson, for plaintiffs in error.

Stuart R. Smith, Walter J. Crawford, and Leon Sonfield, for defendants in error.

Before PARDEE, Circuit Judge, and NEWMAN and SAUNDERS, District Judges.

SAUNDERS, District Judge. 1. This is an action in trespass to try title to a tract of land. The suit was originally brought by John A. McShane and John A. Creighton against J. G. Tompkins et al., as heirs of one A. N. B. Tompkins. Pending the suit the original plaintiffs transferred their title to the Creighton-McShane Oil Company, and that company is, by substitution for the original plaintiffs, now the sole plaintiff. For brevity, the Creighton-McShane Oil Company, plaintiff in the court below, will hereafter be designated simply as the oil company, or as the plaintiff, and the defendants will be

collectively designated as the Tompkins heirs, or simply as the defendant, and the land in controversy, which is situated in Hardin county, Tex., and is minutely described by metes and bounds in the petition, will be designated as the Hawkins survey. Hardin county, in which the land in dispute is situated, was formerly a part of Liberty County.

2. The petition after naming the oil company as plaintiff, and the several Tompkins heirs as defendants, avers that on July 1, 1905, "the plaintiff was in possession of and owned in fee simple" the said Hawkins survey, and "that while so owning and being in possession of said land defendants and each of them unlawfully and by force of arms entered upon said premises and ousted and dispossessed plaintiff therefrom, and still unlawfully and wrongfully and forcibly withhold the possession thereof from the plaintiff, to their damage in the sum of $10,000." The prayer is for citation of defendants "and that, on a final hearing hereof, plaintiff have judgment for said land and its damages, for the restitution thereof; for costs of court," etc. The answer, first, specifically denies that the defendants "are guilty of the wrongs, injuries, or trespasses laid to their charge, or any or either of them as complained of in plaintiff's petition"; then, generally, denies all the allegations of the petition, and, finally, "by way of cross-action," avers that the defendants are the owners of the land in controversy under titles that are now good by prescription, whether they were or were not originally valid.

3. The record shows the following facts: (a) The board of land commissioners of the several counties in the Republic of Texas issued certificates to persons named therein, declaring said persons to be entitled to select and locate a stated quantity of land, and when the proper quantity of land had been so selected, located, and surveyed, the Land Office issued patents therefor. These certificates were sometimes held for years before they were located and patents obtained thereunder to specifically described tracts of land. It was also common for the original certificatee to assign and sell the unlocated certificate, and a number of transfers of the certificate might follow, each successive purchaser acquiring the same right, which the original certificatee had, to locate the quantity of land called for by the certificate and get a patent therefor. The right of the holder of the certificate to select, locate, and demand a patent for the quantity of land called for by the certificate is personal property, and the certificate itself is the evidence of that right. Shifflet v. Morelle, 68 Tex. 391, 4 S. W. 843. Where the original certificatee had assigned and sold the certificate, but the assignment was not filed in the Land Office, the patent would issue to the original certificatee, "his heirs or assigns," though the land was claimed by an assignee. The records of the Office also show to whom the patent was sent.

(b) On February 19, 1838, the board of land commissioners of Jasper county issued to one Benjamin H. Hawkins, certificate No. 140, entitling him to locate and get a patent for one league and labor of land. This original certificate has been lost or destroyed, though it was filed in the Land Office in 1862 and was probably there

in 1868, or even as late as 1878, when the Land Office records have an entry dated February 25, 1878, stating that a duplicate of the original certificate to B. H. Hawkins, that had been issued on the theory that the original was lost, was canceled, "the original certificate having been returned and patented." Both the oil company and the Tompkins heirs set up chains of title running back to one Joseph Criswell, who, as assignee of Hawkins, claimed the certificate. The oil company takes inconsistent and contradictory positions with regard to the assignment of this certificate by Hawkins to Criswell. First, it insists that, as there is no direct proof of, and in its opinion not sufficient circumstantial evidence to prove, the assignment by Hawkins to Criswell, the title of the Tompkins heirs must fail because it does not show even a beginning from Hawkins, whom all parties admit to have been the original certificatee. But this contention is inconsistent with the fact that the oil company itself sets up a title purporting to be derived from Criswell, and necessarily therefore postulating an assignment by Hawkins to Criswell. Moreover, the title that was first bought by McShane and Creighton, who formed the oil company and transferred their rights to it, was the Criswell title, supported by a quitclaim of his interest by one of the Hawkins heirs. It is not a matter of inference that the oil company even now relies upon its Criswell title. Their counsel say so in their brief:

"* * * On the 28th day of October, 1840, Joseph Criswell transferred in writing the said certificate to Wm. Hart, through whom defendant in error claims title by valid transfers of said certificate and the land patented thereunder."

And again they say:

"Joseph Criswell, under whom both plaintiffs in error and defendants in error claim title to the land certificate," etc.

Further, the oil company claims partly under a deed from Silas N. Johnson, and, to show how Johnson acquired his interest in the certificate, the oil company offered the deed under which Johnson acquired from John Mackechney, and this deed recites "that John Mackechney is entitled to this land as the only heir at law of Gilbert Mackechney, deceased, said Gilbert Mackechney having bought said lands from Wm. Hart, and Wm. Hart from Joseph Criswell, assignee of the certificate." The oil company offered this deed without qualification or restriction of any sort, and thereby unequivocally committed itself to the assertion that Criswell was the assignee of the certificate. Apart from the fact that the oil company is thus estopped by the title which it asserts itself as coming from Criswell, by the recitals of the deed which it offered in evidence, and by the declarations of its own counsel in their printed brief to deny that there was an assignment by Hawkins to Criswell, the recitals in deeds offered by the Tompkins heirs strongly confirm, if they do not positively establish, the conclusion that Hawkins did assign the certificate to Criswell. In 1840, Criswell, representing himself as owner of the certificate, sold it to Hart, and the oil company's title, through a long series of intermediate conveyances, all purporting to transfer the certificate, descends from this sale of Criswell to Hart.

Again, in 1848, under an execution issued against Criswell, the sheriff seized, and sold to one Fitzgerald, the certificate itself, and annexed it to his deed. There were a number of successive sales under this Fitzgerald title, most of them mentioning the accompanying presence of the certificate, until it was finally purchased by A. N. B. Tompkins, the ancestor of the present defendants, and he returned it to the Land Office, as shown by the above-cited extract of date February 25, 1878, from the Land Office records, and there it seems to have been in existence till 1868 or 1878. Finally, when the original certificate was located, the entire quantity of land called for by the certificate was given under three separate surveys, and the field notes of two of them, now in the Land Office records, show that they were made "for Joseph Criswell, assignee of B. H. Hawkins." The evidence, then, overwhelmingly demonstrates that Criswell was the assignee of the certificate, and that he was, at least as early as 1840, in possession of the certificate and dealt with it as owner. After this lapse of time, and in view of the admitted loss or destruction of the certificate and the burning of the records of Liberty county and the facts just stated, and as there is no evidence tending in the slightest degree to cast suspicion upon the truth of the numerous references in old deeds and documents to the fact of an assignment to Criswell, it must now be taken that his ownership, as assignee, of the certificate, is satisfactorily, though perhaps not directly, shown, particularly as both plaintiff and defendants assert title based on Criswell's ownership. For the purposes of the case, and in testing the titles of both parties, Criswell must, then, be treated as the owner of the certificate by assignment from Hawkins.

It will be as well here to notice the contention of the oil company that it acquired the legal title to the survey from the heirs of Benj. H. Hawkins, and relies upon the title so acquired as the paramount legal title. The evidence shows that John R. Mackechney purchased from John Mackechney, and John Mackechney inherited as sole heir from Gilbert Mackechney whatever rights Gilbert Mackechney acquired under the sale to him by Wm. Hart in 1846. But the entire evidence in the case, whether offered by the defendant, or by the plaintiff in opening his case, or by the plaintiff on rebuttal, now shows as just pointed out that Benj. H. Hawkins had assigned the certificate to Jos. Criswell. Therefore Hawkins' heirs inherited from him no rights in or to the certificate, and conveyed no rights in or to it by their deeds of sale to John R. Mackechney, of date July 10, 1888, and to Brown-Creighton, of date October 22, 1901. It makes no difference at what stage of the trial, nor by whom, the evidence showing that B. H. Hawkins had assigned to Jos. Criswell was offered. Nor does it matter that this evidence is wholly or largely circumstantial. That evidence is now in the record, and must be given all the weight to which it is entitled, and must have all the consequences which properly result therefrom upon the rights of the parties. As then this evidence shows that the Hawkins heirs had no title of any kind to the certificate, the deeds from these heirs could not and did not convey to the oil company or its authors the paramount legal title, nor any title whatsoever

thereto. The deeds from the Hawkins heirs to the authors of the oil company's title must therefore be wholly laid out of the case, and the oil company must establish, if it can, that it now owns, through successive transfers running back to Criswell, the title to the certificate and to the lands patented thereunder. The inquiry is thus reduced to the determination of the question.

In whom is the Criswell title to the certificate and to the land patented thereunder now vested? Is it in the oil company? Or is it in the Tompkins heirs? To answer this question, the two chains of title coming from Criswell must now be investigated and compared. For convenience, the chain under which the oil company claims may be referred to as the Criswell-Hart-Mackechney chain; and the chain under which the Tompkins heirs claim, as the Criswell-Fitzgerald-Tompkins chain.

1. Criswell-Hart-Mackechney Chain of Title. On October 28, 1840, for a stated consideration of $5,000, Criswell sold a number of land claims to one William Hart. Among them was one described as "the headright of H. B. Hawkins for one league and labor of land." These words certainly do not in themselves describe the certificate No. 140 issued by the board of land commissioners of Jasper county on February 19, 1838, to B. H. Hawkins. But the oil company contends that "H. B." is merely a transposition of "B. H." and "headright" is the equivalent of "certificate," and that the records show that "but one land certificate was issued by the board of land commissioners of Jasper county, Tex., and that was No. 140, to Benj. H. Hawkins, and that no league and labor certificate of the first class was ever issued by the state to H. B. Hawkins." This incident in the sale from Criswell to Hart only shows, as most of the other deeds in this record also show, how loose and inexact in those times were the descriptions of the thing sold, and how it may become necessary to resort to external facts to correct or supplement the description as given in the deed so as to identify the thing. In view of the facts external to the deed, and despite the ambiguous and inaccurate description in the deed itself, there is no doubt but that what Hart sold was, as counsel for the oil company contend, in fact certificate No. 140 issued to B. H. Hawkins on February 19, 1838.

In this deed from Criswell to Hart there is no statement that Criswell delivers to Hart the certificates, or deeds to the certificates, which he purports to sell. It is entirely consistent with the terms of the act to infer that the certificates or deeds therefor were not delivered to Hart. This deed from Criswell to Hart was never recorded.

On August 1, 1846, Wm. Hart sold to Gilbert Mackechney a number of land claims, and among them "the headright of H. B. Hawkins for one league and labor of land." The remarks in the foregoing paragraph upon the description of the thing sold apply with equal force to the description in this deed. Recordation of this deed was made in several counties; in Sabine county on October 7, 1863; in Bee county on September 5, 1877; and in Hardin county on March 5, 1878. In the latter part of 1853, Gilbert Mackechney seems to have become aware that he did not have in his possession either

the certificate to B. H. Hawkins, or any deed therefor. He thereupon proceeded to advertise this certificate as lost, and, after the advertisement had been made, he then made an affidavit averring the loss of the certificate and his advertisement therefor, and on the basis of this advertisement and affidavit he applied for and obtained from the Land Office a duplicate certificate in lieu of the lost original. The advertisement includes certificates of other claims, also acquired under the above deed from Hart. The advertisement, so far as it relates to the Hawkins certificate, is as follows:

### "Lost Land Certificates.

"The headright certificate of B. H. Hawkins for one league and labor of land, No. 140 dated February 19, 1838, issued by the board of land commissioners for Jasper county, * * * which, if not found within 90 days from this date, I shall make application to the proper authorities for duplicates.
"Oct. 6, '53.                                           Gilbert Mackechney."

The affidavit reads thus:

"Gilbert Mackechney being duly and regularly sworn on oath declares that he was the just owner of the following land claims, viz.: the headright certificate of B. H. Hawkins for one league and labor of land, No. 140, dated February 19, 1838, issued by the board of commissioners of Jasper county * * * ; that he has never sold, alienated, or transferred the same in any manner; that they have been lost, and that, since lost, he has neither known or heard of the same; and that he has caused notice of the loss of said certificates to be published in the San Augustine Herald, a newspaper published in San Augustine county, and the one nearest the residence of this affiant, for the time required by law.
"Sworn to December 14, 1853.                            Gilbert Mackechney."

On filing the above advertisement and affidavit in the Land Office, a duplicate certificate was, on May 8, 1854, issued to Gilbert Mackechney, declaring him to be thereunder entitled "to all the benefits granted in said original certificate." It will be observed that Mackechney nowhere asserts, either in his advertisement or in his affidavit, that he ever did have possession of the certificate, or that he lost it. He merely says that the certificate has been lost; he does not say by whom. After obtaining this duplicate certificate Gilbert Mackechney took no action upon it for more than 20 years. Then, on November 7, 1874, he procured the survey of a tract of land in Bee county. He filed this survey, and demanded a patent, and this demand by him for a patent to the land covered by his survey developed the fact that the original certificate had been returned to the Land Office in 1862, and that three patents had issued for three tracts of land in satisfaction of the original certificate; one in 1862, one in 1863, and one in 1868. Thereupon Mackechney's duplicate certificate was marked across the face, "Canceled, the original having been returned and patented February 25, 1878." The records of the Land Office showed then, as they show now, that the patents issued under the original certificate had been sent, at the date of their issuance, to A. N. B. Tompkins, and, as he was a district surveyor, Mackechney could easily have reached him and ascertained from him who it was that claimed the title to the original certificate and to the lands patented under the original certificate.

Gilbert Mackechney died in the early part of 1877, and by his will, offered for probate on April 2, 1877, and probated May 21, 1877, he made his brother John X. Mackechney his sole legatee. On December 21, 1887, more than 10 years after he had probated his brother's will, more than 33 years after the duplicate certificate had issued, and nearly 10 years after that duplicate certificate had been canceled, John Mackechney appointed Silas M. Johnson his attorney in fact "to clear the title to the B. H. Hawkins headright of one league and one labor of land situated in Hardin and Liberty counties, Texas," to which John Mackechney declares he is entitled "as the only heir at law of Gilbert Mackechney, deceased, said Gilbert Mackechney having bought said lands from Wm. Hart and Wm. Hart from Joseph Criswell, assignee of the certificate." And, in consideration of the services to be rendered by Johnson (in clearing the title), John Mackechney conveyed to him one-third undivided interest in the said Hawkins league. This appointment of Mr. Johnson "to clear the title to the B. H. Hawkins headright" shows that Mr. Mackechney knew that his title was not clear, but that it was, on the contrary, in dispute, and that it was claimed by the person, whoever it was, that had located and patented the original survey. The record does not show that Mr. Johnson ever took any steps whatsoever "to clear the title" except by procuring a quitclaim from Peter M. Hawkins, one of the grandchildren and heirs of Benjamin H. Hawkins, to his interest in the Hawkins survey. This step was inconsistent with the title as given in the deed to Johnson himself, wherein it is declared that John Mackechney, who conveyed to Johnson, claimed title as the sole heir of Gilbert Mackechney who "bought said land from William Hart, and William Hart from Joseph Criswell, assignee of the certificate." This transfer from Hawkins, so far from clearing the title, tended to involve it in still greater obscurity by casting suspicion upon the very title which Johnson himself had taken.

Johnson and John Mackechney, on February 7, 1888, conveyed their interest to John R. Mackechney. This deed was recorded on February 11, 1888, in Hardin county. John R. Mackechney seems to have reconveyed on February 9, 1888, a one-third undivided interest to Silas M. Johnson by deed recorded February 11, 1888, and, by two deeds executed on February 27, 1890, John R. Mackechney and Silas M. Johnson conveyed their entire interest in the matter to P. S. Watts and John P. Irvine. These latter conveyed their interests to John A. Creighton, Herman Kountze, and John A. McShane, by deed executed October 6, 1894. During all this time nothing had been done or attempted towards "clearing the title" claimed by the heirs of Gilbert Mackechney. McShane, Kountze, and Creighton, by a series of conveyances, finally transferred the property to the Creighton-McShane Oil Company on April 3, 1906. So much for the Criswell-Hart-Mackechney title on which the oil company relies. It remains to examine the Criswell-Fitzgerald-Tompkins title, on which the Thompkins heirs rely.

2. Criswell-Fitzgerald-Thompkins Chain of Title. On November 18, 1848, W. L. Rogers, sheriff of Nueces county, executed an official deed of sale wherein he declared that under a judgment of a jus-

tice's court against Jos. Criswell he had seized and sold to one Edward Fitzgerald "a certain certificate for land pointed out by the plaintiff as the property of Joseph Criswell, which is hereafter described and set forth * * * said land certificate herein described and set forth, containing one league and one labor of land, issued by the board of land commissioners of Jasper county on the 19th of February A. D. 1838, to Joseph Criswell, assignee of Benj. H. Hawkins, and numbered 140, which is hereto attached and made part of this instrument by reference. * * *" The above description is erroneous in stating that the certificate was issued to Joseph Criswell; it was in fact issued to Benj. H. Hawkins, and, after being so issued, it was then assigned by Benj. H. Hawkins to Joseph Criswell. But all the other items of the description are correct, and fully identify the certificate as the one issued to B. H. Hawkins. The admission which the counsel for the oil company offered to cure, the incorrect description of the certificate in the sale from Criswell to Hart, and in the sale from Hart to Gilbert Mackechney, serves equally to correct the description in the sheriff's deed to Fitzgerald, and to identify the certificate as the Hawkins certificate. There are wax marks in the margin of this sheriff's deed which show that a paper was once attached thereto. This was probably the certificate which the deed declares was attached. Fitzgerald sold one-half of the certificate to Manning, and Manning sold it to Durst, and Durst to E. A. and R. I. Palmer. Then the Palmers sold the entire certificate to Nevill, and Nevill sold it to A. N. B. Tompkins, who was the father or grandfather of the defendants. It does not appear how the Palmers came to own the entire certificate, but it is shown that Manning by suit compelled Fitzgerald, or his heirs, to transfer to him the entire certificate. A. N. B. Tompkins acquired the certificate on March 23, 1859. He proceeded at once to cause surveys to be made for three tracts of land, in the aggregate covering the amount of land called for by the certificate. The survey for the tract now in controversy was made on April 21, 1859, less than a month after Tompkins had purchased the certificate. But he does not seem to have filed this survey in the Land Office till May 12, 1862. On this survey and on the surrender of the certificate a patent issued on June 30, 1862, "to Benjamin H. Hawkins his heirs or assigns." As Benjamin H. Hawkins had assigned the certificate to Jos. Criswell, neither he nor his heirs took anything under the patent, which necessarily inured to the benefit of Criswell and his assigns. With the issuance of the patent, the legal situation changed. The certificate was merged in the patent, and a tract of land was conveyed and delivered by the state in discharge of its obligation and promise in the certificate. Tompkins no longer held the state's promise to give land; he held the land itself. He was in possession claiming to be owner, and his claim was based upon ownership and possession in good faith of the Hawkins certificate. There is not the slightest evidence tending to show that Tompkins suspected or had any reason to suspect that his title to the certificate was not perfect. The oil company contends that the deed to Tompkins was a mere nullity because of a provision

in a Texas statute of date August 28, 1856, which forbids district surveyors from "being concerned in the purchase of any right, title or interest in any public land, in his own name or in the name of any other person," under penalty of removal from office, and fine not exceeding $500, and exclusion from subsequently holding any other office under the state. Pen. Code 1857, art. 244. The statute does not annul the title acquired by the district surveyor, but only subjects the surveyor to severe penalties in case he acquires title to any public land. The title of Tompkins cannot then be regarded as void on this ground.

Tompkins having thus, as he supposed, transformed the certificate entitling him to land into the land itself, we must now see what he did in the matter of taking possession of the land patented under the certificate. The evidence on this point is meager. In regard to the taxes it is shown that the Hawkins survey was assessed or rendered for taxes to A. N. B. Tompkins for the years 1860 to 1872, both inclusive, and for the year 1876. And there is testimony going to show that Tompkins paid the taxes for some of these years at least, possibly for all. One of the heirs remembers having seen receipts for taxes on the property, but he does not remember how many. One witness, Morgan Rye, testifies that in 1868 A. N. B. Tompkins offered to sell him this tract of land. He went with Mr. Tompkins and looked at the land, but did not like to locate on it. He says, "It was heavily timbered in some places, and in others it was marshy, with a pin-oak growth of timber." He also testifies that "in 1877 A. N. B. Tompkins came to me and wanted to borrow some money. He claimed to own this land and other tracts, and wanted to mortgage them to me and borrow some money." J. G. Tompkins, a son of A. N. B. Tompkins, testifies that his father claimed to be the owner of the Hawkins survey ever since he could remember. He says that he and his father were on the land when he was 12 or 13 years old, and his father pointed out to him some of the corners and told him that that was the Hawkins tract and that he owned it. He has heard his father say a number of times that he owned the Hawkins land. O. J. Delano, another witness, states that he knew that Tompkins claimed to own the Hawkins survey in 1876, and at that time Tompkins sold him and his sister, Mrs. Haralson, a part of this survey containing 320 acres for $320. He says:

"When I bought the land I did not go to the records to see whether I had title to it. Mr. Tompkins asserted title to the land, and told me it was his; and that is all I know about it."

The deed from A. N. B. Tompkins to O. J. Delano and his sister, Mrs. Eliza Haralson, duly recorded for 320 acres of the Hawkins survey, was offered in evidence. Mrs. Haralson sold her half of the 320 acres to Dr. W. P. Callen, who still has it. He says he has claimed the land ever since he had it. A witness for the plaintiffs testifies that he knew A. N. B. Tompkins and his children well, and never heard them claim title to the land until lately; "that country was a pretty wild country until late years. There was no occasion to know who were the landowners. At that time the land was not

regarded as valuable for a long time." He also adds that "he did not know who owned large tracts of land in the country. I did not know anything about the ownership of land, and did not care anything about it. For the past 4 or 5 years it has been pretty well known who owned land in that country." Another witness for the plaintiffs, W. W. McConnico, sheriff and tax collector for Hardin County, testifies regarding the land as follows:

"I hunted over that survey from 1868 to 1881. No one had lived on the land up to 1881. The Hawkins survey is the biggest part of the 'Big Thicket.' I do not think fifty acres could be found on the whole survey that could be cultivated."

Several witnesses prove that the heirs of A. N. B. Tompkins have claimed to be the owners of the land since his death. In 1904 these heirs placed one Lott in possession as tenant, and he is still in possession of the land. It was unoccupied and had been unoccupied for several years at the time that Lott went on it in 1904.

The land covered by the Hawkins survey seems to have been marshy and uncleared, and, for the most part, uninhabitable. The timber on it had no value, and the land seems to have had no appreciable value for any purpose. Tompkins did not clear the land, nor did he inclose it, nor did he put a tenant upon it. All that he did was to speak of the land as his own, to sell a part of it, to have the tract assessed to him on the assessment rolls of the county, and to pay the taxes on it. His heirs put no one in possession of the land until the year 1904. In the meantime the plaintiffs had put a tenant on the land in 1901, who occupied it for 12 or 18 months and then voluntarily abandoned it. Under these circumstances the defendants cannot claim title by prescription. There was no such "actual and visible appropriation of the land," as was required under article 3198 of the Revised Statutes of Texas (1879), to set the statute in motion so as to give rise to a prescriptive title. It is also well settled in Texas that "an adverse possession of the certificate, no matter how long continued, does not operate as an assignment of the certificate or of the right to the land of which it is the evidence." Sayles' Real Estate Laws of Texas, vol. 1, art. 293, and authorities there cited. Tomkins, therefore, cannot claim ownership of the certificate under a prescriptive title.

Putting out of consideration the defendants' claim to title by prescription, we must next determine whether the defendants have title to the land in controversy, or had title to the certificate, in any other way. As we have seen, the Tompkins title comes from an alleged sheriff's sale of the certificate itself in 1848. It is admitted that the record of the suit in which the sheriff's sale took place has been lost or destroyed. All that remains of that suit is the sheriff's deed to the certificate. The sheriff's deed, under these circumstances, may be offered without offering the judgment and the writ of execution issued thereunder in support of the deed. A party cannot be bound to produce what has confessedly been lost or destroyed, and after the lapse of so long a time the case is a proper one for the application of the maxim "omnia præsumuntur rite acta." It may therefore be

assumed that the judgment was regularly obtained, and that execution regularly issued thereunder. The sheriff's deed shows that under this execution the original certificate "was pointed out to me as the property of Joseph Criswell." The deed does not state who pointed out the certificate, nor does it state that the certificate was in the possession of Criswell when it was pointed out to the sheriff. As it would have been irregular for the sheriff to seize property belonging to any one but the defendant Criswell, and as in the ordinary course of business the defendant's property was most likely to be in his own possession, it may be assumed that the certificate was so situated with respect to possession and apparent ownership, as to justify the sheriff in seizing it as the property of Criswell, the defendant in execution.

Under the presumption of the maxim "as to the regularity of judicial proceedings," we thus have an apparently regular judicial sale of the certificate as the property of Criswell. The case of Barker v. Swenson, 66 Tex. 407–411, 1 S. W. 117, the Supreme Court of Texas say:

"It is said that a land certificate may be sold under execution, or in course of an administration, and that the right to acquire land under it will pass to the purchaser, and this is true; but it is upon the theory that the certificate symbolizes the right, which is the thing sold in such cases, as is it when the owner of such certificate makes a voluntary sale."

There is no evidence which positively shows, either that the certificate did get back into Criswell's possession, or how it got back into his possession. But in view of the fact that; eight years after he had ostensibly sold it, it was seized as his property, it may fairly be presumed that it was in his possession when seized. This may be so if we assume that Hart did not actually take possession of the certificate when he purchased it from Criswell, but that he left it in Criswell's possession. And he might have been willing to leave it in Criswell's possession for a number of reasons. Just such a case seems to have occurred in Baggett v. McKenzie, 28 Tex. 581. Baggett acquired a certificate from Watson but left it in Watson's possession, and Watson sold it to McKenzie. The Supreme Court of Texas say (page 583 of 28 Tex.):

"He [Baggett] left the certificate subject to the control of Watson, and cannot complain if thereby he has lost interest in it, which he might otherwise have asserted. If his title bond gave Baggett an interest in the certificate, had he exercised the slightest diligence or reasonable prudence, he would have had it duly authenticated and deposited in the General Land Office, with the field notes of the survey, and thus have prevented Watson from lifting it from the land, or procuring the unlocated balance of the certificate which he sold to McKenzie. Having failed to do this, he must be postponed to the subsequent purchaser, who in good faith has acquired the better right to the certificate."

As the law assumes fair and honest dealing until the contrary is proven, it is fair to presume that Criswell's possession of the certificate was with the consent of his vendee. In this situation the vendee, having left the certificate in the possession of the vendor, and that possession having continued more than two years, the voluntary sale by the vendor himself or the forced sale by a creditor of the vendor,

would carry the title to the certificate. We therefore consider that the title to the certificate passed at the sheriff's sale. And this assumption is justified by the long inaction of Gilbert Mackechney, who then had the adverse title to the certificate. He purchased the certificate in 1846. It is not shown that he ever had actual possession thereof. He advertised it as lost in 1853, and procured a duplicate certificate in 1854. Instead of at once locating this duplicate certificate, he lay by and did nothing for over 20 years, and neither he nor his heir or assignee did anything to develop or attack the adverse title of the Tompkins heirs during the next 25 years. This long delay casts a serious suspicion upon the validity of the Mackechney title. On the other hand, the comparative promptness with which the opposing title was asserted by Tompkins indicates that the holders of that title were confident in its validity, and did everything that was likely to challenge contest by any opposing claimant.

All of these facts should have been submitted to the jury, and as the record is now before us under a peremptory instruction to the jury to find for the plaintiff, we hold that these facts establish the title in the defendant. The case should have been submitted to the jury under proper instruction, and coming to us on the entire record we find that the verdict should unquestionably have been for the defendants.

The judgment must therefore be reversed, and the case remanded for a new trial, with instructions to the lower court to proceed in accordance with the views herein expressed.

## On Rehearing.

PER CURIAM. The last two paragraphs of our opinion in this case filed March 10, 1908, are stricken and withdrawn, and in lieu thereof the following is substituted:

On the trial in the court below the trial judge of his own motion gave a peremptory instruction to the jury to find in favor of the plaintiffs. This, under our view of the evidence and the legitimate conclusions to be drawn therefrom, was clearly erroneous. The case should have been submitted to the jury under instructions covering the legitimate presumptions which arise on the facts developed by the evidence and as outlined in this opinion.

The judgment of the Circuit Court is reversed and the cause is remanded, with instructions to award a new trial and thereafter proceed in accordance with law and the views herein expressed.

And as thus amended we are satisfied with our decision of the case. The petition for rehearing is denied.